1  THE O'MARA LAW FIRM, P.C.
   DAVID C. O'MARA
2  NEVADA BAR NO. 8599
   311 East Liberty St.
3  Reno, Nevada 89501
   775-323-1321
4  775-323-4082 (fax)

5

6  BARNOW AND ASSOCIATES, P.C.
   Anthony L. Parkhill*
   205 West Randolph Street, Suite 1630
7  Chicago, IL 60606
   Tel: 312.621.2000
8  Fax: 312.641.5504
   aparkhill@barnowlaw.com
9  *Pro hac vice* forthcoming

10 *Counsel for Plaintiff*

11                  **UNITED STATES DISTRICT COURT**
12                       **DISTRICT OF NEVADA**

13 RONALD GARRETT, individually and on      )
   behalf of all others similarly situated, )
14                                          )  Case No.
                   Plaintiffs,             )
15                                          )  CLASS ACTION
   v.                                       )
16                                          )  JURY TRIAL DEMANDED
   EFFORTLESS OFFICE ENTERPRISES,          )
17 LLC and NEVADA HEART AND                 )
   VASCULAR CENTER, LLP,                    )
18                                          )
                   Defendants.             )
19                                          )
                                            )
20 _____ )

21

22                    **CLASS ACTION COMPLAINT**

23       Plaintiff Ronald Garrett ("Plaintiff"), individually, and on behalf of all others similarly

24 situated (collectively, "Class members"), by and through his attorneys, brings this Class Action

25 Complaint against Defendants Effortless Office Enterprises, LLC ("EOE") and Nevada Heart and

26 Vascular Center, LLP ("NHVC" and, with EOE, "Defendants"), and complains and alleges upon

27 personal knowledge as to himself and information and belief as to all other matters.

28                                          1

INTRODUCTION

1.      Plaintiff brings this class action against Defendants for their failure to secure and safeguard approximately 681,418 individuals', including Plaintiff's, personally identifying information ("PII") and personal health information ("PHI"), including names, Social Security numbers, taxpayer identification numbers, driver's license or state identification numbers, passport numbers, dates of birth, account numbers, routing numbers, security codes, payment card numbers, payment card PINs, payment card expiration dates, health insurance information, medical information, and biometric data.

2.      NHVC is a healthcare provider offering cardiac and vascular-related care. EOE is an IT, cloud, and cybersecurity service provider, and is a third-party vendor of NHVC.

3.      Between approximately May 9, 2024 and July 23, 2024, an unauthorized third party gained access to EOE's network systems and accessed and acquired files containing the PII/PHI of NHVC's patients and employees, as well as customers of other EOE clients, including Plaintiff and Class members (the "Data Breach").

4.      Defendants owed a duty to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. Defendants breached that duty by, among other things, failing to, or sharing PII/PHI with third parties that failed to, implement and maintain reasonable security procedures and practices to protect Plaintiff's and Class members' PII/PHI from unauthorized access and disclosure.

5.      As a result of Defendants' inadequate security and breach of their duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' PII/PHI was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this

action on behalf of himself and all persons whose PII/PHI was exposed as a result of the Data Breach, which occurred between approximately May 9, 2024 and July 23, 2024.

6.    Plaintiff, on behalf of himself and all other Class members, asserts claims for negligence, breach of fiduciary duty, breach of implied contract, unjust enrichment, and violations of the Nevada Consumer Fraud Act, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

*Plaintiff Ronald Garrett*

7.    Plaintiff is a citizen and resident of Nevada.

8.    Plaintiff is a patient of NHVC. As a condition of providing healthcare services to Plaintiff, NHVC required Plaintiff to provide it with his PII/PHI. NHVC in turn shared Plaintiff's PII/PHI with EOE in connection with obtaining EOE's services.

9.    Based on representations made by Defendants, Plaintiff believed that Defendants had implemented and maintained reasonable security and practices to protect his PII/PHI. With this belief in mind, Plaintiff provided his PII/PHI to NHVC in exchange for receiving healthcare services from NHVC.

10.    At all relevant times, Defendants stored, shared, and maintained Plaintiff's PII/PHI on their network systems, including the systems impacted in the Data Breach.

11.    Plaintiff received a notice letter from EOE notifying him that his PII/PHI was in the files accessed and acquired by an unauthorized third party in the Data Breach.

12.    Had Plaintiff known that Defendants do not adequately protect the PII/PHI they collect, share, and maintain, he would not have agreed to provide his PII/PHI to or obtained healthcare services from NHVC.

13.     Since the Data Breach occurred, Plaintiff's credit score has decreased at all of the major credit bureaus. Reasonably believing this to be a potential sign of fraud and identity theft resulting from the Data Breach, Plaintiff froze his credit and signed up for a subscription to LifeLock credit monitoring at a cost of over $200.

14.     Plaintiff has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including time and effort spent traveling to his bank to update his financial accounts' security measures, reviewing his accounts and credit scores, and freezing his credit.

15.     Plaintiff has experienced fear, frustration, and stress because his PII/PHI was accessed and stolen by unauthorized third parties in the Data Breach, including because he must closely monitor his PII/PHI for signs of misuse and identity theft for the rest of his life.

16.     As a direct result of the Data Breach, Plaintiff has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of his highly sensitive PII/PHI; time and effort lost attempting to mitigate the harm caused by the Data Breach; and deprivation of the value of his PII/PHI.

### Defendant Effortless Office Enterprises, LLC

17.     Defendant Effortless Office Enterprises is a Nevada corporation with its principal place of business located at 3130 S. Rainbow Blvd., #303, Las Vegas, NV 89146. It may be served through its registered agent: Evans & Associates, 2400 S Cimarron Rd., Suite 140, Las Vegas, NV 89117.

### Defendant Nevada Heart and Vascular Center, LLP

18.     Defendant Nevada Heart and Vascular Center, LLP is a Nevada partnership with its headquarters located at 5795 Arville St., Las Vegas, NV 89118. It may be served through its registered agent: Alan C. Sklar, 410 S. Rampart Blvd., Suite 350, Las Vegas, NV 89145.

4

**JURISDICTION AND VENUE**

19.     The Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendants' citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

20.     This Court has general personal jurisdiction over Defendants because they are organized under the laws of this State and maintains their principal place of business in this District.

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants' principal places of business are in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

**FACTUAL ALLEGATIONS**

***Overview of Defendants***

22.     EOE is a managed services provider delivering IT, cloud, and cybersecurity services.[1] NHVC is a healthcare provider offering comprehensive cardiac and vascular care.[2] NHVC has 12 locations in southern Nevada.[3] EOE provides services to NHVC.

23.     In the regular course of its business, NHVC collects and maintains the PII/PHI of its patients, including Plaintiff and Class members. NHVC requires patients to provide it with their PII/PHI, including the PII/PHI stolen in the Data Breach, before it provides them services. NHVC in turn shares the PII/PHI it collects and maintains with EOE in connection with obtaining services from EOE.

---

[1] *About Effortless*, EOE, https://effortlessoffice.com/about/ (last accessed Aug. 6, 2025).

[2] *About Us*, NHVC, https://nevadaheart.com/about-us/ (last accessed Aug. 6, 2025).

[3] *See Our Locations*, NHVC, https://nevadaheart.com/locations/#1470692541256-ce44fca5-0d8c (last accessed Aug. 6, 2025).

24.     EOE's website contains a Privacy Policy that describes how EOE collects, uses, discloses, and protects the PII/PHI it collects and stores.[4] In its Privacy Policy, EOE states it is "dedicated to protecting the privacy and security of personal information entrusted to us by our clients, partners, and website visitors."[5]

25.     EOE acknowledges that "privacy is critical in today's digital environment," and promises it is "committed to safeguarding the personal information of our clients, partners, and website visitors."[6] It further promises its privacy practices "are designed to meet the highest standards of data protection and security, ensuring your information is handled with care and respect."[7] It also represents it is "SOC 2 Type 2 certified, reflecting our dedication to maintaining robust security, availability, and confidentiality of the data we process."[8]

26.     EOE promises it "implement[s] robust security measures to protect your information."[9] This includes measures such as encryption, access controls, security audits, and incident responses to data breaches.[10] EOE further claims to offer "Backup and Disaster Recovery, Email Security, and Security Awareness Training, to further safeguard client data."[11]

---

[4] *Privacy Policy of Effortless*, EOE (Apr. 28, 2025), https://effortlessoffice.com/privacy-policy/.

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

6

27.    EOE promises it retains PII/PHI only as long as necessary, and that it will "securely delete or anonymize the data in accordance with industry best practices" once the PII/PHI is no longer needed.[12]

28.    NHVC's website contains a Privacy Notice that describes how NHVC may use and disclose its patient's PII/PHI, including for treatment, payment, and healthcare operations purposes.[13] NHVC states it will post a copy of the Privacy Notice in its offices in a visible location at all times.[14]

29.    In the Privacy Notice, NHVC states it will obtain patients' written consent before disclosing PII/PHI in ways not described in the Privacy Notice.[15]

30.    NHVC promises it is "dedicated to maintaining the privacy of your individually identifiable health information."[16] NHVC further admits it is "required by law to maintain the confidentiality of health information that identifies you" and is required to follow the terms of the Privacy Notice.[17]

31.    Plaintiff and Class members entrusted NHVC or one of EOE's other clients with their PII/PHI in exchange for receiving services, and whose PII/PHI was in turn shared with EOE.

---

[12] *Id.*

[13] *Patient Privacy*, NHVC, https://nevadaheart.com/patient-portal/#1470587029497-007fcc0a-6ff6 (last accessed Aug. 6, 2025).

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.*

***The Data Breach***

32.     Between approximately May 9, 2024 and July 23, 2024, an unauthorized third party gained access to EOE's network systems and accessed and acquired the PII/PHI of EOE's clients' customers, including their names, Social Security numbers, taxpayer identification numbers, driver's license or state identification numbers, passport numbers, dates of birth, account numbers, routing numbers, security codes, payment card numbers, payment card PINs, payment card expiration dates, health insurance information, medical information, and biometric data.[18]

33.     Following an investigation, on or about May 12, 2025, NHVC learned that "personal information related to certain current/former employees, residents and/or associated parties was impacted" in the Data Breach,[19] including names, Social Security numbers, dates of birth, driver's license or state identification numbers, health insurance information, medical information, passport numbers, taxpayer identification numbers, account numbers, and routing numbers.[20]

34.     While EOE has not disclosed when it discovered the Data Breach, NHVC learned patient information was stolen on or about May 12, 2025, but Defendants waited until approximately June 13, 2025—over 13 months after the Data Breach began and more than a month after NHVC learned patient information was impacted—to begin notifying Plaintiff and Class members that the Data Breach occurred and that their PII/PHI was accessed and acquired by unauthorized persons.[21]

35.     Defendants acknowledges that the Data Breach places Plaintiff and Class members in imminent danger of fraud and identity. The data breach notice on NHVC's website warns patients

---

[18] *Notification of Data Security Incident*, PR NEWSWIRE (June 13, 2025 8:00 PM), https://www.prnewswire.com/news-releases/notification-of-data-security-incident-302481531.html.

[19] *Cyberevent Notice*, NHVC, https://nevadaheart.com/notice/ (last accessed Aug. 6, 2025).

[20] *Id.*

[21] *See id.*

they should review their account statements and credit reports and alert law enforcement if they detect fraudulent activity.[22]

36.    Defendants' failure to promptly notify Plaintiff and Class members that their PII/PHI was disclosed, accessed, and stolen virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse, or disseminate that PII/PHI before Plaintiff and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiff and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

### Defendants Knew that Criminals Target PII/PHI

37.    At all relevant times, Defendants knew, or should have known, that the PII/PHI that they collected, shared, and stored was a target for malicious actors. Indeed, EOE offers cybersecurity services including response plans to security breaches[23] and data protection services.[24] Despite such knowledge, Defendants failed to, or shared PII/PHI with third parties that failed to, implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII/PHI from unauthorized disclosures and cyberattacks that they should have anticipated and guarded against.

38.    It is well known among companies that store sensitive personally identifying information that such information—such as the PII/PHI stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are

---

[22] *Id.*

[23] *Security Advisory Services*, EOE, https://effortlessoffice.com/services/security-advisory-services/ (last accessed Aug. 6, 2025).

[24] *Data Protection*, EOE, https://effortlessoffice.com/solutions/data-protection/ (last accessed Aug. 6, 2025).

on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws

in . . . systems either online or in stores."[25]

39.    Cyber criminals seek out PHI at a greater rate than other sources of personal

information. In a 2025 report, Kroll found that "the healthcare industry was the most breached" in

2024.[26] The company found that 23% of the breaches that it handled responses for were from the

healthcare industry, up from 18% in 2023.[27]

40.    PII/PHI is a valuable property right.[28] The value of PII/PHI as a commodity is

measurable.[29] "Firms are now able to attain significant market valuations by employing business

models predicated on the successful use of personal data within the existing legal and regulatory

frameworks."[30] American companies are estimated to have spent over $19 billion on acquiring

---

[25] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[26] *Data Breach Outlook*, KROLL,

https://www.kroll.com/en/insights/publications/cyber/data-breach-outlook-2025 (last accessed Aug. 6, 2025).

[27] *See id*.

[28] *See* Marc van Lieshout, *The Value of Personal Data*, 457 Int'l Fed'n for Info. Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . ."), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[29] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[30] Organization for Economic Co-operation and Development, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD ILIBRARY (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

personal data of consumers in 2018.[31] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

41.     As a result of the real and significant value of these data, identity thieves and other cyber criminals have openly posted credit card numbers, Social Security numbers, PII/PHI, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

42.     PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[32] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[33]

43.     All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, Social Security Numbers, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[34] According to a report released by the Federal Bureau of

---

[31] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

[32] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAG. (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[33] *Id.*

[34] *See* SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAG. (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

11

Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[35]

44.    Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[36] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[37]

45.    Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[38]

46.    Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

---

[35] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

[36] Steager, *supra* note 32.

[37] *Id.*

[38] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

12

*Theft of PII/PHI Has Grave and Lasting Consequences for Victims*

47.     Theft of PII/PHI can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII/PHI to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[39] [40]

48.     Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[41]

49.     Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[42]

50.     Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records

---

[39] *See* Federal Trade Commission, *What to Know About Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Aug. 6, 2025).

[40] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[41] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[42] Identity Theft Resource Center, *2023 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last accessed Aug. 6, 2025).

that can plague victims' medical and financial lives for years."[43] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[44] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care."[45] The FTC also warns, "If the thief's health information is mixed with yours it could affect the medical care you're able to get or the health insurance benefits you're able to use."[46]

51.    A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

a.    Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

b.    Significant bills for medical goods and services neither sought nor received.

c.    Issues with insurance, co-pays, and insurance caps.

d.    Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

e.    Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

---

[43] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, WORLD PRIV. F. (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.

[44] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk . . .*, *supra* note 35.

[45] *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed Aug. 6, 2025).

[46] *Id*.

14

f.    As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

g.    Phantom medical debt collection based on medical billing or other identity information.

h.    Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.[47]

52.    There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[48]

53.    It is within this context that Plaintiff and all other Class members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by someone intending to use that information for any number of improper purposes and scams, including making the information available for sale on the black-market.

### *Damages Sustained by Plaintiff and Class Members*

54.    Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the disclosure, compromise, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of

---

[47] *See* Dixon & Emerson, *supra* note 43.

[48] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI

compromised as a result of the Data Breach; and (vii) overpayment for the services that were

received without adequate data security.

## CLASS ALLEGATIONS

55.     This action is brought and may be properly maintained as a class action pursuant to

Fed. R. Civ. P. 23.

56.     Plaintiff brings this action on behalf of himself and all members of the following

Class of similarly situated persons:

> All persons whose personally identifiable information or personal health
> information was accessed in the Data Breach by unauthorized persons, including
> all persons who were sent a notice of the Data Breach.

57.     Plaintiff also brings this action on behalf of himself and all members of the following

subclass (the "NHVC Subclass")

> All persons whose personally identifiable information or personal health
> information was given to Effortless Office Enterprises, LLC by Nevada Heart and
> Vascular Center, LLP and was accessed in the Data Breach by unauthorized
> persons, including all such persons who were sent a notice of the Data Breach.

58.     Excluded from the Class are Effortless Office Enterprises, LLC and its affiliates,

parents, subsidiaries, officers, agents, and directors; Nevada Heart and Vascular Center, LLP and its

affiliates, parents, subsidiaries, officers, agents, and directors; as well as the judge(s) presiding over

this matter and the clerks of said judge.

59.     Certification of Plaintiff's claims for class-wide treatment is appropriate because

Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would

be used to prove those elements in individual actions alleging the same claims.

16

60.     The members in the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. EOE reported to the Oregon Department of Justice that the Data Breach affected approximately 681,418 persons.[49]

61.     Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

      a. Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII/PHI from unauthorized access and disclosure;

      b. Whether Defendants had a duty not to disclose the PII/PHI of Plaintiff and Class members to unauthorized third parties;

      c. Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII/PHI;

      d. Whether Defendants breached those duties to protect Plaintiff's and Class members' PII/PHI; and

      e. Whether Plaintiff and Class members are entitled to damages and the measure of such damages and relief.

62.     Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

63.     Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had his PII/PHI compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by

---

[49]     *Search Data Breaches*, OR. DEP'T JUSTICE (Aug. 4, 2025), https://justice.oregon.gov/consumer/DataBreach/.

17

Defendants, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

64. Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that he has no interests adverse to, or that conflict with, the Class he seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

65. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress from Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

66. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

67. Defendants owed a duty to Plaintiff and Class members to exercise reasonable care in safeguarding and protecting the PII/PHI it collected and shared.

18

68.  Defendants' duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

69.  Defendants' duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by business, such as Defendants, of failing to employ reasonable measures to protect and secure PII/PHI.

70.  Defendants violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to, or sharing PII/PHI with third-party vendors who failed to, use reasonable measures to protect Plaintiff's and other Class members' PII/PHI, by failing to provide timely notice, and by not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII/PHI they obtain and share, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

71.  Plaintiff and Class members are within the class of persons that HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

72.  The harm occurring as a result of the Data Breach is the type of harm that HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiff and Class members as a result of the Data Breach.

73.    Defendants knew or should have known the risks of collecting, storing, and sharing Plaintiff's and all other Class members' PII/PHI and the importance of sharing PII/PHI with third-party vendors who maintain secure systems. Defendants knew or should have known of the many data breaches that targeted entities that collect and share PII/PHI in recent years.

74.    Given the nature of Defendants' businesses, the sensitivity and value of the PII/PHI they collect, maintain, and share, and the resources at their disposal, Defendants should have identified the vulnerabilities to their systems and prevented the Data Breach from occurring.

75.    Defendants breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to, or sharing PII/PHI with third-party vendors who failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to them—including Plaintiff's and Class members' PII/PHI.

76.    It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding, protecting, and sharing Plaintiff's and Class members' PII/PHI by failing to, or sharing PII/PHI with third-party vendors who failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

77.    But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII/PHI would not have been compromised.

78.    As a result of Defendants' above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class members

20

have suffered and will continue to suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## COUNT II
## BREACH OF FIDUCIARY DUTY
### *On Behalf of the NHVC Subclass Against NHVC Only*

79.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

80.    Plaintiff brings this claim individually and on behalf of the NHVC Subclass against NHVC only.[50]

81.    Plaintiff and Class members gave NHVC their PII/PHI in confidence, believing that NHVC would protect that information. Plaintiff and Class members would not have provided NHVC with this information had they known it would not be adequately protected. NHVC's acceptance and storage of Plaintiff's and Class members' PII/PHI created a fiduciary relationship between NHVC and Plaintiff and Class members. In light of this relationship, NHVC must act primarily for the benefit of its patients, which includes safeguarding and protecting Plaintiff's and Class members' PII/PHI.

---

[50] As used in this claim, "Class members" refers to members of the NHVC Subclass.

21

82.     Due to the nature of the relationship between NHVC and Plaintiff and Class members, Plaintiff and Class members were entirely reliant upon NHVC to ensure that their PII/PHI was adequately protected. Plaintiff and Class members had no way of verifying or influencing the nature and extent of NHVC's or its third-party vendors' data security policies and practices, and NHVC was in an exclusive position to guard against the Data Breach.

83.     NHVC has a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of their relationship. It breached that duty by failing to, and sharing PII/PHI with third-party vendors who failed to, properly protect the integrity of the system containing Plaintiff's and Class members' PII/PHI, failing to comply with the data security guidelines set forth by HIPAA, and otherwise failing to safeguard Plaintiff's and Class members' PII/PHI that it collected and shared.

84.     As a direct and proximate result of NHVC's breaches of its fiduciary duties, Plaintiff and Class members have suffered and will continue to suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in NHVC's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

22

## <u>COUNT III</u>
### BREACH OF IMPLIED CONTRACT
### *On Behalf of the NHVC Subclass Against NHVC Only*

85.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

86.    Plaintiff brings this claim individually and on behalf of the NHVC Subclass against NHVC only.[51]

87.    In connection with receiving healthcare services, Plaintiff and all other Class members entered into implied contracts with NHVC.

88.    Pursuant to these implied contracts, Plaintiff and Class members paid money to NHVC, directly or through their insurance, provided NHVC with their PII/PHI. In exchange, NHVC agreed to, among other things, and Plaintiff and Class members understood that NHVC would: (1) provide healthcare services to Plaintiff and Class members; (2) collect, maintain, and utilize Plaintiff's and Class members' PII/PHI to, among other things, facilitate treatment and the provision of healthcare services to Plaintiff and Class members; (3) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' PII/PHI; (4) protect Plaintiff's and Class members' PII/PHI in compliance with federal and state laws and regulations, industry standards, and NHVC's representations; and (5) maintain the confidentiality of Plaintiff's and Class members' PII/PHI and protect it from unauthorized access, disclosure, theft, and misuse.

89.    The protection of PII/PHI was a material term of the implied contracts between Plaintiff and Class members, on the one hand, and NHVC, on the other hand. Indeed, as set forth *supra*, NHVC recognized the importance of data security and the privacy of its patients'

---

[51] As used in this claim, "Class members" refers to members of the NHVC Subclass.

23

PII/PHI in its Privacy Policy. Had Plaintiff and Class members known that NHVC would not adequately protect its patients' PII/PHI, including by sharing their PII/PHI with third-party vendors who failed to have adequate security measures in place, they would not have agreed to provide NHVC with their PII/PHI or received healthcare services from NHVC.

90.      Plaintiff and Class members performed their obligations under the implied contract when they provided NHVC with their PII/PHI and paid—directly or through their insurers—for healthcare services from NHVC.

91.      NHVC breached its obligations under its implied contracts with Plaintiff and Class members in failing to, and sharing PII/PHI with third-party vendors who failed to, implement and maintain reasonable security measures to protect and secure their PII/PHI and in failing to implement and maintain reasonable security protocols and procedures to protect Plaintiff's and Class members' PII/PHI in a manner that complies with applicable laws, regulations, industry standards, and NHVC's representations.

92.      NHVC's breach of its obligations of its implied contracts with Plaintiff and Class members directly resulted in the Data Breach and the injuries that Plaintiff and all other Class members have suffered from the Data Breach.

93.      Plaintiff and all other Class members were damaged by NHVC's breach of implied contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased

1    risks of identity theft they face and will continue to face; and (vii) overpayment for services that

2    were received without adequate data security.

3                                                    **COUNT IV**

4                                          **UNJUST ENRICHMENT**

5        94.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if

6    fully set forth herein.

7        95.    This claim is pleaded in the alternative to the breach of implied contract claim.

8        96.    Plaintiff and Class members conferred a monetary benefit upon Defendants in the

9    form of monies paid to NHVC for healthcare services and through the provision of their PII/PHI,

10   which NHVC in turn used to pay EOE for its services. Plaintiff did so with an implicit understanding

11   that Defendants would use some of these payments to protect the PII/PHI they collect, store, and use

12   to provide health care.

13

14       97.    Defendants accepted or had knowledge of the benefits conferred upon them by

15   Plaintiff and Class members. Defendants also benefitted from the receipt of Plaintiff's and Class

16   members' PII/PHI, as this was used to facilitate their business operations and billing services.

17       98.    As a result of Defendants' conduct, Plaintiff and Class members suffered actual

18   damages in an amount equal to the difference in value between their payments made with reasonable

19   data privacy and security practices and procedures that they paid for, and those payments without

20   reasonable data privacy and security practices and procedures that they received.

21

22       99.    Defendants should not be permitted to retain the money belonging to Plaintiff and

23   Class members because Defendants failed to, or shared PII/PHI with third-party vendors who failed

24   to, adequately implement the data privacy and security procedures for themselves that Plaintiff and

25   Class members paid for and that were otherwise mandated by federal, state, and local laws and

26   industry standards.

27

28                                                        25

100.    Plaintiff and Class members have no adequate remedy at law.

101.    Defendants should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

**COUNT V**
**VIOLATIONS OF THE NEVADA CONSUMER FRAUD ACT,**
**NRS 41.600, et seq. ("NCFA")**
***On Behalf of the NHVC Subclass Against NHVC Only***

102.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

103.    Plaintiff brings this claim individually and on behalf of the NHVC Subclass against NHVC only.[52]

104.    Pursuant to the NCFA, "[a]n action may be brought by any person who is a victim of a consumer fraud." NRS 41.600(1).

105.    NHVC offered and continues to offer healthcare services in the State of Nevada.

106.    Plaintiff and Class members purchased and received healthcare services from NHVC for personal, family, or household purposes.

107.    Pursuant to the NCFA, a deceptive practice pursuant to NRS 598.0915 constitutes a consumer fraud pursuant to the NCFA. NRS 41.600(2)(e).

108.    NHVC engaged in consumer fraud in violation of the NCFA by failing to, and sharing PII/PHI with third-party vendors who failed to, implement and maintain reasonable security measures to protect and secure its patients' PII/PHI in a manner that complied with applicable laws, regulations, industry standards, and NHVC's representations.

---

[52] As used in this claim, "Class members" refers to members of the NHVC Subclass.

26

109.    NRS 598.0915 lists 16 deceptive trade practices. NHVC's representations that it would adequately protect Plaintiff's and Class members' PII/PHI constitute as the following violations of NHVC:

    a.    "Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model." NRS 598.0915(7).

    b.    "Advertises goods or services with intent not to sell or lease them as advertised." NRS 598.0915(9).

    c.    "Knowingly makes any other false representation in a transaction." NRS 598.0915(15).

110.    NHVC makes explicit statements to its patients that their PII/PHI will remain private.

111.    Due to the Data Breach, Plaintiff and Class members have lost property in the form of their PII/PHI. Further, NHVC's failure to adopt reasonable practices in protecting and safeguarding its patients' PII/PHI will force Plaintiff and Class members to spend time or money to protect against identity theft. Plaintiff and Class members are now at a higher risk of medical identity theft and other crimes. This harm sufficiently outweighs any justifications or motives for NHVC's practice of collecting and storing PII/PHI without appropriate and reasonable safeguards to protect such information.

112.    As a result of NHVC's violations of the NCFA, Plaintiff and Class members have suffered and will continue to suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and

future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in NHVC's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

113.    Pursuant to the NCFA, Plaintiff seeks damages on behalf of himself and the putative class, any equitable relief that the Court deems appropriate, and reasonable attorneys' fees and costs. NRS 41.600(3).

<strong>PRAYER FOR RELIEF</strong>

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in his favor and against Defendants as follows:

A.    Certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B.    Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.    Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of himself and the Class, seeks appropriate injunctive relief designed to prevent Defendants from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D.    Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.    Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

1      F.      Awarding Plaintiff and the Class such other favorable relief as allowable under

2    law.

3                              **JURY TRIAL DEMANDED**

4        Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

5    DATED: August 12, 2025                    THE O'MARA LAW FIRM, P.C.

6

7                                                      /s/ David C. O'Mara
8                                             DAVID C. O'MARA, ESQ

9                                        311 East Liberty St.
                                         Reno, Nevada 89501
10                                       775-323-1321
                                         775-323-4082 (fax)
11                                       *Counsel for Plaintiff*

12                                       Anthony L. Parkhill*
                                         **BARNOW AND ASSOCIATES, P.C.** 205
13                                       West Randolph Street, Suite 1630
                                         Chicago, IL 60606
14                                       Tel: 312.621.2000
                                         Fax: 312.641.5504
15                                       aparkhill@barnowlaw.com

16                                       *Counsel for Plaintiff*

17                                       **Pro hac vice* forthcoming

18

19

20

21

22

23

24

25

26

27

28                                          29